## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS, BOSTON DIVISION

| | |
|---|---|
| YVONNE LESTER, individually and on behalf of all others similarly situated, <br><br> *Plaintiff,* <br><br> v. <br><br> EVERQUOTE, INC., f/k/a AdHarmonics, Inc., a Delaware corporation, <br><br> *Defendant.* | CASE NO. <br><br><br><br><br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Yvonne Lester ("Lester") brings this Class Action Complaint and Demand for Jury Trial ("Complaint") against Defendant EverQuote, Inc., f/k/a AdHarmonics, Inc. ("EverQuote"), to stop its practice of sending unsolicited text messages to the cellular telephones of consumers nationwide and to obtain redress for all persons injured by its conduct. Plaintiff, for her complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

### NATURE OF THE ACTION

1.     Defendant EverQuote generates auto insurance sales leads. It claims to be "an independent insurance marketplace" that delivers "connections to auto insurance consumers."[1]

2.     Unfortunately, in order to find the customers to "connect" with auto insurance providers, Defendant utilized and benefited from text messaging campaigns whereby unsolicited messages were repeatedly sent, without consent, to thousands of cellular telephone numbers, all

---

[1]     *See About*, EverQuote, https://www.everquote.com/about/ (last visited March 21, 2016).

by using automatic dialing equipment that has the capacity to store and dial telephone numbers, *en masse*. Defendant benefitted from these text messages because they drove traffic to Defendant's intake websites so that it could collect consumer leads to sell to auto insurance dealers. Because these text messages were sent without the prior express written consent of the text recipients, Defendant violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA").

3.     The TCPA was enacted to protect consumers from unauthorized calls exactly like those alleged in this Complaint—autodialed solicitations to cellphone numbers placed without each consumer's prior express written consent.

4.     Defendant's violations caused Plaintiff and the members of the putative Class of consumers (defined below) to experience actual harm, including the aggravation, nuisance, and invasion of privacy that necessarily accompanies the receipt of unsolicited text messages.

5.     In response to Defendant's unlawful conduct, Plaintiff files the instant lawsuit, seeking an injunction requiring Defendant to cease all unsolicited text messaging and to prevent similar conduct in the future, as well as an award of statutory damages to the members of the putative Class under the TCPA, together with costs and reasonable attorneys' fees.

**PARTIES**

6.     Plaintiff Yvonne Lester is a natural person domiciled in the State of Florida.

7.     Defendant EverQuote is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in this District at 210 Broadway, Cambridge, Massachusetts 02139. Defendant EverQuote regularly does business throughout the Commonwealth of Massachusetts and in this District.

## JURISDICTION AND VENUE

8.      This Court has original jurisdiction over the claims in this action pursuant to 28

U.S.C. § 1331 because they arise under the Telephone Consumer Protection Act, 47 U.S.C. §

227, which is a federal statute.

9.      The Court has personal jurisdiction over Defendant and venue is proper in this

District because Defendant is headquartered in this District, because Defendant transacts

significant amounts of business within this District, and because the conduct giving rise to

Plaintiff's claims occurred in and/or was directed from this District.

## COMMON FACTUAL ALLEGATIONS

10.      EverQuote is an "internet marketing firm" whose business relies upon its ability

to connect "carriers and agents" with "auto insurance consumers."[2]

11.      EverQuote boasts that its "ability to unite consumers with local agents and

carriers with the most relevant range of competitive rates and coverage options . . . regardless of

device type is unparalleled."[3] It "leverage[s] technology to connect directly and efficiently" with

consumers, thus generating the leads that it ultimately sells to its insurance agent customers.[4]

12.      EverQuote primarily generates these leads by directing consumers to its "owned

and operated auto insurance websites."[5] When those consumers submit personal information on

these sites, they become the "consumer leads" that EverQuote ultimately sells.

13.      To drive consumers to its websites in the first place, however, EverQuote often

---

[2]      *About*, EverQuote, https://www.everquote.com/about/ (last visited April 1, 2016).

[3]      *See Myths of the Mobile Insurance Shopper Debunked*, EverQuote,
https://www.everquote.com/news/mobile-insurance-shopper-myths-debunked/ (last visited April 1, 2016).

[4]      *About*, EverQuote, https://www.everquote.com/about/ (last visited April 1, 2016).

[5]      *EverQuote Leads FAQs*, EverQuote, https://pro.everquote.com/faq (last visited April 1, 2016).

uses "affiliates or other third parties" to distribute website links on its behalf.[6] For example,

EverQuote participates in "cost per action" campaigns where it creates custom intake websites

and then compensates marketers for driving visitors to these websites. When a website visitor

submits certain information (*i.e.*, take certain "actions"), EverQuote pays those marketers their

share.

14.     Defendant's marketers drive this website traffic by sending links to consumers

through a variety of mediums, including referral websites, banner advertisements, and email lists.

15.     Defendant's marketers also send links through bulk text-messaging campaigns

that are operated using equipment that has the capacity to store or produce telephone numbers,

and to dial such numbers, *en masse*, without any need for human intervention. These text-

messaging campaigns are carried out without the necessary prior express written consent of the

text recipients, all in violation of the TCPA.

16.     For example, Defendant, with the help of its marketers, spammed consumers with

numerous text messages containing links to "http://auto-conx.net," which, in turn, automatically

redirected visitors to websites such as "www.cheap-auto-insurance-savings.com" and

"www.cheaperautocoverage.com," which are intake websites owned and operated by Defendant

EverQuote.[7]

17.     From a consumer's perspective, clicking on "http://auto-conx.net" was no

---

[6]     *See EverQuote Pro Terms of Use*, EverQuote, https://pro.everquote.com/leads_terms (last visited April 1, 2016) (disclosing that "EverQuote may use affiliates or other third parties to generate Leads and Lead Data.").

[7]     Both "www.cheap-auto-insurance-savings.com" and "www.cheaperautocoverage.com" are registered in the name of EverQuote's predecessor company, AdHarmonics. *See, e.g.*, DomainSigma for "cheap-auto-insurance-savings.com," available at http://domainsigma.com/ whois/cheap-auto-insurance-savings.com (last accessed April 1, 2016) (showing "Registrant Organization" of "AdHarmonics," "Registrant Email" of "admin@adharmonics.com," and EverQuote's current address and phone number.).

different from clicking on "www.cheap-auto-insurance-savings.com" or "www.cheaperauto coverage.com" because his or her browser would immediately display those pages. There was no intermediary landing page, no other choices for consumers to make, and no other buttons to click. In other words, for the purposes of EverQuote's text message marketing—and in consumers' minds—"http://auto-conx.net" *is* an EverQuote website.

18.     Defendant directly benefits from its text message campaigns because its business model depends on generating new auto insurance leads. The more text messages that are sent, the more leads it can generate. For this reason, it incentivizes its marketing partners to continue sending text messages, ultimately to generate more leads, and profits, for EverQuote.

19.     EverQuote has the ability to track the amount, and origin, of traffic to these websites through analytics provided by its network partners. As such, EverQuote knew, or should have known, of every instance in which its web traffic was generated via text message campaigns that distributed the "http://auto-conx.net" website link.

20.     These bulk-messaging campaigns were made with equipment that has the capacity to store or produce telephone numbers, and to dial such number, *en masse*, without any need for human intervention and despite the fact that the text recipients did not provide their prior express written consent, all in violation of the TCPA.

21.     Despite having knowledge of the numerous TCPA violations being made for its benefit and on its behalf, Defendant continued to pay marketers to distribute these unlawful text messages, accepting the benefits of such practices rather than putting a stop to them.

22.     The TCPA was enacted to give consumers control over how and where they receive calls and text messages. When EverQuote's marketing text messages are sent to customers without their consent, it fails to address or respect the limitations imposed by the

TCPA, thereby taking control away from consumers and violating both the spirit and letter of the TCPA.

### FACTS SPECIFIC TO PLAINTIFF YVONNE LESTER

23.     Plaintiff Yvonne Lester is the subscriber to and customary user of a personal cellular telephone number.

24.     Beginning in December of 2015, Plaintiff Lester started receiving multiple text messages to her cellular telephone number, stating that she qualified for special auto insurance rates and directing her to visit "http://auto-conx.net."

25.     For example, on January 22, 2016, Plaintiff (whose name is *not* Madeline) received an unsolicited text message requesting that she visit "http://auto-conx.net" because some "New State Rule Qualifies [Her] for 19.00/Month Auto Insurance." *See* <u>Figure 1</u>, below.



(Figure 1.)

26.     The hyperlink provided in this text message routed directly (*i.e.*, without any other landing page appearing), to websites such as "www.cheap-auto-insurance-savings.com"

and "www.cheaperautocoverage.com." Both of these websites are owned and operated by Defendant EverQuote for the purpose of acquiring new insurance leads.

27.     Though Plaintiff replied "STOP" to these text messages, as directed, she continued to receive text messages directing her to visit Defendant's websites.

28.     Plaintiff was not and is not in the market for auto insurance and never provided her consent for EverQuote or any other auto insurance company to contact her. She did not express an interest in receiving information about auto insurance to any person or entity, including Defendant.

29.     Moreover, Plaintiff did not provide her phone number to Defendant or any third-party operating on its behalf, let alone provide her prior express written consent to receive text message calls promoting auto insurance sales.

30.     Defendant and/or others acting on its behalf knowingly sent these text messages to Plaintiff and thousands of members of the putative Class using equipment that has the capacity to store or produce telephone numbers to be called and to dial such numbers, *en masse*, simultaneously and without human intervention.

### CLASS ALLEGATIONS

31.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself and a Class of similarly situated individuals, defined as follows:

> All persons in the United States who (1) received a text message; (2) on his or her cellular telephone; (3) containing a link to "http://auto-conx.net"; (4) that would direct to an EverQuote website; and (5) for whom Defendant and/or its agents have no written record of prior express consent to send such text messages.

32.     The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's

subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its

parents have a controlling interest and its current or former employees, officers and directors; (3)

persons who properly execute and file a timely request for exclusion from the Class; (4) persons

whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5)

Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and

assigns of any such excluded persons.

33.     **Numerosity**: The exact number of members within the Class is unknown and not

available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On

information and belief, Defendant has sent text messages to thousands of consumers who fall

into the definition of the Class. Members of the Class can be identified through Defendant's

records.

34.     **Typicality**: Plaintiff's claims are typical of the claims of other members of the

Class, as Plaintiff and the members of the Class sustained damages arising out of Defendant's

uniform wrongful conduct.

35.     **Adequate Representation**: Plaintiff will fairly and adequately represent and

protect the interests of the Class, and she has retained counsel competent and experienced in

complex class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant

has no defenses unique to Plaintiff.

36.     **Commonality and Predominance**: There are many questions of law and fact

common to the claims of Plaintiff and the Class, and those questions predominate over any

questions that may affect individual members of the Class. Common questions for the Class

include, but are not necessarily limited to the following:

     (a)     Whether Defendant systematically and knowingly profited from campaigns that sent text messages to consumers' cellular telephones without their prior express written consent;

     (b)     Whether Defendant's text messages were sent to consumers' cellular telephones utilizing an automatic telephone dialing system;

     (c)     Whether Defendant's conduct violated the TCPA;

     (d)     Whether Plaintiff and the members of the Class are entitled to statutory and treble damages based on the willfulness of Defendant's conduct.

37.    **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all parties is impracticable, and the damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be fostered and uniformity of decisions ensured.

## COUNT I
### Violation of the TCPA, 47 U.S.C. § 227
### (On behalf of Plaintiff and the Class)

38.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

39.     Defendant and/or its agents sent unsolicited telemarketing text messages to cellular telephone numbers belonging to Plaintiff and the other members of the Class without having their prior express written consent.

40.     Defendant sent these text messages, or had them sent on its behalf, using equipment that had the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and to dial such numbers, *en masse*.

41.     These text messages were sent to Plaintiff and other members of the Class simultaneously and without human intervention.

42.     By having these unsolicited text messages sent to Plaintiff and the Class, Defendant has violated 47 U.S.C. § 227(b)(1)(A)(iii). As a result of Defendant's unlawful conduct, the members of the Class suffered actual harm in the forms of statutory violations, invasion of privacy, and any monies lost as a result of receiving the unsolicited text messages on their cellular phones. Under 47 U.S.C. § 227(b)(3)(B), Plaintiff and the Class members are each entitled to, *inter alia*, a minimum of $500.00 in damages for each such violation of the TCPA.

43.     Should the Court determine that Defendant's conduct was willful and knowing, the Court should, pursuant to 47 U.S.C. § 227(b)(3), treble the amount of statutory damages recoverable by Plaintiff and the other members of the Class.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Yvonne Lester, individually and on behalf of the Class, prays for the following relief:

A.      An order certifying the Class as defined above, appointing Plaintiff Yvonne Lester as the representative of the Class, and appointing her counsel as Class Counsel;

B.      An award of actual and statutory damages;

C.      An order declaring that Defendant's actions, as set out above, violate the TCPA;

D.      A declaratory judgment that Defendant's telephone calling equipment constitutes an automatic telephone dialing system under the TCPA;

E.      An order requiring Defendant to disgorge any ill-gotten funds acquired as a result of its unlawful telephone calling practices;

F.      An order requiring Defendant to identify any and all third-parties involved in the text messaging activities as set out above, as well as the terms of any contract or compensation arrangement it has with such third-parties;

G.      An injunction requiring Defendant to cease all unsolicited text message activities, and otherwise protecting the interests of the Class;

H.      An injunction prohibiting Defendant from using, or contracting the use of, an automatic telephone dialing system without obtaining, and maintaining records of, each call recipient's prior express written consent to receive calls made with such equipment;

I.      An injunction prohibiting Defendant from contracting with any third-party for marketing purposes until it establishes and implements policies and procedures for ensuring the third-party's compliance with the TCPA;

J.      An injunction prohibiting Defendant from conducting any future telemarketing activities until it has established an internal Do Not Call List as required by the TCPA;

K.      An award of reasonable attorneys' fees and costs; and

L.      Such other and further relief that the Court deems reasonable and just.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.


Respectfully submitted,


Dated: April 1, 16

**YVONNE LESTER**, individually and on behalf of all others similarly situated,


By:  /s/EricaC Mirabella

Erica C. Mirabella
erica@mirabellaLLC.com
MIRABELLA LAW LLC
132 Boylston Street, 5th Floor
Boston, Massachusetts 02116
Tel: 617.580.8270
Fax: 617.583.1905

Rafey S. Balabanian*
rbalabanian@edelson.com
EDELSON PC
329 Bryant Street
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

Stefan Coleman*
law@stefancoleman.com
LAW OFFICES OF STEFAN COLEMAN, LLC
201 S. Biscayne Blvd., 28th Floor
Miami, Florida 33131
Tel: 877.333.9427
Fax: 888.498.8946

* *Pro hac vice* application to be filed.

*Attorneys for Plaintiff and the putative Class.*